RESOURCE RECYCLING
CORPORATION, INC.,
Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 02–79 C.

United States Court of Federal Claims.

March 14, 2003.

---

James Lynn Perry, Daniel, Upton, Perry & Morris, P.C., Daphne Alabama, argued for plaintiffs.

Kenneth S. Kessler, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, argued for defendant.

## OPINION AND ORDER

BLOCK, Judge.

For more than 40 years, B–52 Stratofortresses have been the backbone of the American manned strategic bomber force. The B–52 first flew in 1954. Total production amounted to 744, with the last, the H model, delivered in October 1962. When updated with modern technology, engineering analyses show that the life span of the B–52H extends, incredibly, beyond the year 2045. There are approximately 100 H models in the U.S. Air Force fleet. These remaining B–52s play a crucial role in defense of American and allied security. *Available at* http://www.af.mil/news/factsheets/B_52_Stratofortress.html.

This action is a dispute over the remains of many of the earlier B–52s, all venerable war veterans that saw service on many fronts. Specifically, it is an action for breach of an implied contract arising out of a government bid for the sale of recyclable aluminum scrap from the hulks of old B–52 bombers. Before the court is defendant's motion to dismiss the complaint under the Rules of the Court of Federal Claims 12(b)(1) and 12(b)(6). For the reasons set forth below, defendant's motion is granted.

### I. Facts

The facts, unless otherwise noted, are undisputed and are drawn from the complaint, defendant's motion to dismiss, plaintiff's motion in opposition, and the appendices attached thereto.

In November of 1994, the Defense Reutilization and Marketing Service ("DRMS"), an agency of the Department of Defense, advertised a bid sale of between 8,470,000 and 24,860,000 pounds of aluminum resulting from the scrapped hulking skeletal remains of B–52 aircraft situated at an aero-graveyard at Davis–Monthon Air Force Base, Tucson, Arizona. The scrap metal had value as recyclable materials, assuming the winning bidder could resell the materials at a profit after they were recycled.

Plaintiff, Resource Recycling International, Inc. ("RRII"), submitted a bid for the materials on December 13, 1994. But its bid was rejected as a "non-responsive negative"

bid on January 24, 1995, by DRMS in a letter sent to RRII by Ms. Sara Hales, the Sales Control Officer (the equivalent of the more frequently used designation "contracting officer" or "CO") at the DRMS. It was termed a "negative bid" because instead of paying the government initially for the parts, RRII sought to take the parts on credit, and then reimburse the government once they were resold at a profit.

After learning that their bid was rejected, RRII wrote a letter, dated January 25, 1995, to the CO demanding that the bid be reevaluated, contending that nothing in the terms and conditions of the DRMS sale offer indicated that negative bids were prohibited. In fact, the Code of Federal Regulations ("CFR") title 41, section 101–45.304–9 prohibited sales of personal property by the government on credit unless specifically authorized by the Administrator of the General Services Agency. Such authorization was neither sought nor obtained.

Thereafter, on January 27, 1995, RRII filed a bid protest with the General Accounting Office ("GAO") alleging that RRII had submitted a "high bid" and that DRMS was unjustified in finding its bid to be non-responsive. Although it is unclear to the court exactly how the CO knew that RRII would file a bid protest with the GAO, the CO, in a letter dated January 26, 1995, informed RRII that the issues raised in RRII's earlier letters to the CO, including its January 25 correspondence, would be addressed by the government in its response to the bid protest.

Even though it had filed a bid protest with the GAO, on February 6, 1995, RRII filed a "claim" with the DRMS for approximately $9.6 million alleging that the DRMS' handling of RRII's bid constituted a breach of an implied contract. The DRMS thereafter closed the sale and rejected all remaining bids on February 17 after determining that none of the bids would allow the government to turn a profit. Because of this latest government action in the B–52 scrap saga, RRII consequently a mended its claim of $9.6 million in damages to request an equitable adjustment. On February 23, 1995, the GAO informed RRII by letter that, because the

government had closed the sale and rejected all bids, RRII's bid protest was "academic" and would be given no further consideration by the agency.

On March 2, 1995, the DRMS reoffered the B–52 scrap, and invited RRII and others to a pre-bid conference where any questions or comments could be raised by any of the bidders. RRII responded indicating that it would attend the conference. Nonetheless, no further mention of either the reoffering or the conference is made in any of documents submitted to the court.

Over six years later, on May 29, 2001, RRII's newly retained counsel filed the very same "claim" with the CO, contending that there had not been a final decision on RRII's 1995 claim for $9.614 million as required by the Contact Disputes Act (41 U.S.C. § 609 *et seq.* (2002) (hereinafter "Contracts Disputes Act" or "CDA")). Thereafter, on July 27, 2001, RRII's new attorney contacted Mr. Thomas Wallenfang, Vice President, Procurement/Contracting, and likewise maintained that there had not been a final decision on RRII's 1995 claim as required by the CDA and requested that a final decision be rendered. A different CO, Mr. Gregory E. Ortiz, subsequently on August 27, 2001, issued what was denoted a "final decision" under the CDA to RRII, stating that the government's original rejection of RRII's bid as non-responsive was proper and that, in any event, the applicable statute of limitations and the doctrine of laches barred RRII's action.

RRII afterward commenced this claim in this court on January 30, 2002, seeking $9.614 million in compensatory damages, other monetary damages, interest, costs, and other equitable relief. Jurisdiction was asserted under 28 U.S.C. § 1346 (this section, erroneously cited, is entitled "United States as defendant," and is inapplicable to this court because it applies only to U.S. District Courts) and the CDA. In response, defendant filed this motion to dismiss pursuant to both RCFC 12(b)(1) and RCFC 12(b)(6).

## II. Discussion

RCFC 12(b)(6) mandates dismissal of a case where the plaintiff fails to state a claim

upon which relief can be granted. When faced with a Rule 12(b)(6) motion, the court should grant the motion only if "it appears beyond doubt that [plaintiff] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (quoting *Conley v. Gibson,* 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Consolidated Edison Co. v. O'Leary,* 117 F.3d 538, 542 (Fed.Cir.1997), *cert. denied sub nom. Consolidated Edison Co. v. Pena,* 522 U.S. 1108, 118 S.Ct. 1036, 140 L.Ed.2d 103 (1998). The facts must be viewed in a light most favorable to the plaintiff. *Papasan v. Allain,* 478 U.S. 265, 283, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)); *Gould Inc. v. United States,* 935 F.2d 1271, 1274 (Fed. Cir.1991).

RCFC 12(b)(1) directs dismissal when the court lacks jurisdiction over the subject matter of the case. When deciding on a motion to dismiss based on lack of subject matter jurisdiction, much like a Rule 12(b)(6) motion, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *E.g., Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Boyle v. United States,* 200 F.3d 1369, 1372 (Fed.Cir.2000); *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995); *Ho v. United States,* 49 Fed.Cl. 96, 100 (2001), *aff'd,* 30 Fed.Appx. 964 (Fed.Cir.2002).

Conversely, unlike a Rule 12(b)(6) motion, when hearing a motion under Rule 12(b)(1), the court can consider matters outside the pleadings. *Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1584 (Fed.Cir.1993), *cert. denied,* 512 U.S. 1235, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994) ("[i]n establishing predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits' and deposition testimony"). Furthermore, unlike a Rule 12(b)(6) motion, a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), may be raised by the court *sua sponte* at any time. *Fanning, Phillips & Molnar v. West,*

160 F.3d 717, 720 (Fed.Cir.1998) (quoting *Booth v. United States,* 990 F.2d 617, 620 (Fed.Cir.1993), *reh'g denied* (1993)).

## A. Plaintiff's Contract Disputes Act Claim

Defendant argues that the complaint must be dismissed for several reasons. First, RRII's pleadings do not state a claim under the CDA, which requires a contract between a contractor and the government. No such contract was ever consummated here. Instead, the claim is a bid protest, which falls under the Tucker Act at 28 U.S.C. § 1491(b)(1). Consequently, the court has no jurisdiction under the CDA to adjudicate the claim. Second, the claim is time-barred under either the Tucker Act or the CDA because the claim accrued in 1995. Finally, defendant maintains that RRII's claim is barred by the doctrine of laches.

In response, RRII argues that upon submitting its bid, an implied in fact contract arose between RRII and the government under which the government promised to treat the bid fairly. This contract, RRII asserts, is governed by the CDA and, in order to comply with the CDA, RRII tried on numerous occasions to obtain a final decision from the DRMS. In RRII's view, it was not until August 21, 2001, that the CO rendered a decision and expressly labeled it "final decision." Because a final decision is a prerequisite for filing a claim in this court, RRII maintains, its claim cannot be considered tardy and time barred.

As a rejoinder to defendant's Tucker Act argument, RRII cites only one authority in all of its written submissions and at oral argument. Plaintiff construes the case, *Control Data Systems, Inc. v. United States,* 32 Fed.Cl. 520 (1994), to stand for the proposition that while bid protests are implied in fact contracts under 28 U.S.C. § 1491(a)(3), "implied in fact contracts are *not* contracts within the Court of Federal Claim's Tucker Act jurisdiction." Pl.'s Resp. to Def.'s Mot. to Dismiss (emphasis added). From this reading of *Control Data Systems,* plaintiff spins an astonishing argument which is summarized as follows: (1) the court has jurisdiction under 28 U.S.C. § 1491(a)(3) to adjudi-

cate implied in fact bid protest contracts; (2) case law holds that such a claim does not fall under the Tucker Act; (3) in this case a "final decision" on RRII's implied contract claim was rendered by the CO, albeit not until August 21, 2001; (4) therefore, pursuant to the above factors, it must be that plaintiff's claim is under the CDA.

Plaintiff's strained logic is permeated with confusion. For instance, plaintiff was apparently unaware that section 1491(a)(3) was promulgated to allow this court to afford hitherto forbidden equitable relief in pre-award contract bid cases and is, thus, inapplicable here because plaintiff is seeking monetary damages. *See* Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, § 133(a), 96 Stat. 25, 40 (1982); *see also United States v. John C. Grimberg, Inc.,* 702 F.2d 1362, 1368 (Fed.Cir.1983) (interpreting the newly-passed section (a)(3) as a congressional grant of equitable power in bid protest cases). Plaintiff also was obviously unaware that this section was repealed in 1996 with passage of the Administrative Dispute Resolution Act. 28 U.S.C. § 1491(b); Pub.L. No. 104–320, 110 Stat. 3870 (1996) ("ADRA") (the ADRA conferred an independent statutory basis for both pre-award and post-award contract bid protest cases).

■ Regardless of plaintiff's convoluted syllogism, even a cursory reading of the CDA reveals that its scope is limited under section 602(a) to "any express or implied contract ... entered into by an executive agency for the procurement of property, other than real property in being; the procurement of services; procurement of services for the construction, alteration, repair and maintenance of real property; or for the disposal of personal property." 41 U.S.C. § 602(a) (2002). Simply put, the CDA does not cover all government contracts. It requires a crucial element missing in our case—an express or implied contract between a *contractor* and the government. It is beyond cavil that RRII was not a contractor because no express or implied contact was ever entered into between RRII and the government for services or property as defined by the CDA. *See Oakland Steel Corporation v. United States,* 33 Fed.Cl. 611, 614–615 (1995). And,

to be sure, it has long been established that the CDA does not encompass so-called "implied in fact" contracts arising from bid protests. "Congress explicitly specified the types of contracts that it intended the Act to cover. An implied contract to treat bids honestly and fairly is not one of them. '[T]he [Act] deals with contractors, not with disappointed bidders....'" *Coastal Corporation v. United States,* 713 F.2d 728, 730 (Fed.Cir. 1983) (quoting *John C. Grimberg, Inc.,* 702 F.2d at 1368).

■ RRII's cited authority, *Control Data Systems, Inc.,* is not to the contrary. The issue in this case was whether the Court of Federal Claims had jurisdiction under then 28 U.S.C. § 1491(a)(3) of the Tucker Act of an action by an incumbent contractor to enjoin an award of a possible bid solicitation by another party to a follow-on contract that had been awarded to the incumbent contractor. The court held that it lacked jurisdiction because the contract predicated on the solicitation was awarded and fully performed and because the government neither solicited nor received a bid for the follow-on contract. In doing so, the court clearly recognized that then section 1491(a)(3) encompassed only "pre-award bid protests." *Control Data Systems, Inc.,* 32 Fed.Cl. at 523–524.

In reaching this conclusion, this court noted that pre-award bid protest claims were originally created by judicial fiat. As such, although historically categorized as "implied-in-fact" contracts, the court correctly viewed the label a misnomer, indistinguishable from "implied-in-law" contracts, of which clearly the Court of Federal Claims lacked jurisdiction under the Tucker Act. *Id.* at 524 n. 9 ("Implied-in-law contracts are not contracts within this court's Tucker Act jurisdiction. [citations omitted] ....While the pre-award bidder's situation came to be characterized as an implied-in-fact contract, it more closely resembles one implied-in-law, since it was originally imposed as a matter of equity and public policy, rather than because there was an actual meeting of the minds ..."). Confounded by this *dictum* expounding the historical jurisprudential genesis of bid protests claims, plaintiff's counsel concocted a false *a priori* assumption that the Tucker Act did

not encompass bid protest claims, predictably leading to a flawed deductive conclusion that since such claims exist they must fall under the CDA.

Perhaps contributing to RRII's present counsel's perplexed state is the labeling of the August 27, 2001 letter of CO Ortiz to RRII as a "final decision." It is apparent to the court that this correspondence has no legal significance other than as a polite response to RRII's recently persistent yet stale attempt to revive a so-called claim made more than six years earlier. The record shows the first CO knew that RRII would file a bid protest with the GAO on January 27, 1995, and informed RRII that the GAO's decision would constitute the CO's response to RRII's rejection of their bid and to other of their raised issues relayed to the CO in various letters. The record also demonstrates that on February 23, 1995, the GAO informed RRII by letter that, because the government had closed the sale and rejected all bids, RRII's bid protest was "academic" and would be given no further consideration by the agency. It is clear that all parties, including the plaintiff, considered RRII's objection to its bid a bid protest. The record of these facts is uncontroverted.

In like manner, the February 6, 1995 "claim" filed by RRII with the DRMS for alleged breach of an implied contract was of no legal consequence. While some sort of response at that time would have been a polite and civil deed, the CO had no legal duty to respond. It is most unfortunate that the DRMS did not respond until years later. This tardiness certainly could have contributed to plaintiff's counsel's confusion. Nevertheless, while a court may interpret the law and impose remedies under the same, it may not proscribe and rectify incivility and bad manners. The base lead of both the bad manners of the DRMS and the mislabeling of the August 27, 2001 letter by the CO as a "final decision" cannot transmute RRII's claim into the glittering gold of a successful damage claim under the CDA.

In light of the foregoing, RRII's claim for breach of an implied contract under the CDA is hereby dismissed.

## B. Plaintiff's Possible Tucker Act Claim

At oral argument, plaintiff's counsel raised, for the first time, that RRII's implied in fact breach of contract bid protest claim more properly falls under section 1491(a)(1) of the Tucker Act. 28 U.S.C. § 1491(a)(1) (2002). This provision was interpreted by the United States Supreme Court merely as a waiver of sovereign immunity which serves as a jurisdictional grant to this court over claims (1) founded on an express or implied contract with the United States; (2) for a refund from a prior payment made to the government; or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), *reh'g denied,* 425 U.S. 957, 96 S.Ct. 1736, 48 L.Ed.2d 202 (1976) (citing *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 605–606, 372 F.2d 1002, 1009 (1967)). Accordingly, while conferring jurisdiction, the Tucker Act by itself has long been held not to create a substantive right enforceable against the United States for money damages. *E.g., United States v. Testan,* 424 U.S. at 398, 96 S.Ct. 948.

Now repealed section 1491(a)(3) was, nevertheless, construed by courts to buttress the judicially-created claim to protest a government bid process. *Southfork Systems, Inc. v. United States,* 141 F.3d 1124, 1132 (Fed. Cir.1998) (quoting *John C. Grimberg Co.,* 702 F.2d at 1367; *Central Arkansas Maintenance, Inc.,* 68 F.3d at 1341). The contractual vehicle in bid protest cases was an implied contract to treat bids fairly and honestly. *E.g., Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1078–80 (Fed. Cir.2001); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1331–1332 (Fed.Cir.2001). More specifically, the theory was that submission of a bid to the government gave rise to an implied in fact contract between the government and the bidder that the government would give the bid a fair and honest consideration. *Impresa Construzioni Geom. Domenico Garufi,* 238 F.3d at 1331–32.

The passage in 1996 of the ADRA, as noted, replaced section 1491(a)(3) of the Tucker Act with section 1491(b), which reads:

(1) Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement . . . .

(2) To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

Yet unresolved is whether the passage of the ADRA in 1996 abolished the court created implied in fact contract theory under the Tucker Act, the theory on which plaintiff now conveniently hangs its hat. *Compare Lion Raisins, Inc., v. United States*, 52 Fed.Cl. 115, 117 (2002) (holding that the ADRA abolished the implied contract theory but noting that "the Federal Circuit has not had occasion to determine whether the implied in fact contract theory of bid protest jurisdiction under section 1491(a)(1) survives the 1996 enactment of the ADRA"); *with Unified Architecture & Eng'g, Inc. v. United States*, 46 Fed.Cl. 56, 60 (2000) ("[a]lthough in many cases the ADRA amendments obviate the need to frame a bid protest claim as a breach of implied-in-fact contract claim, the amendments do not supercede the implied contract theory of good faith and honest consideration as defendant contends"). Nevertheless, this court need not reach this question for two very apparent reasons.

First, even assuming that plaintiff intended all along to specify Tucker Act section 1491(a)(1) as the appropriate jurisdictional authority, and that the citation to 28 U.S.C. § 1346 was some sort of bizarre typographical, or more understandably, clerical error, courts are rightfully loathe to allow a party to raise an issue at oral argument for the first time because there is a lack of notice to the court and adversary. *See Cubic Defense Systems v. United States*, 45 Fed.Cl. 450, 466–468 (1999) (noting that to permit such a tactic would contravene notice pleading requirements of modern federal rules of appellate and civil procedure and would condone "litigation by ambush"). And second, RRII's alleged breach of an implied contract claim under the Tucker Act would be time-barred.

## C. Whether Plaintiff's Alleged Tucker Act Bid Protest Claim Is Time-barred

■ The statute of limitations for a claim brought before the Court of Federal Claims is six years. 28 U.S.C. § 2501 (2002). The statute begins tolling when the claim first accrues, "accrual" being defined as the time when "all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed.Cir.1988) (citing *Japanese War Notes Claimants Ass'n of the Philippines, Inc. v. United States*, 178 Ct.Cl. 630, 373 F.2d 356, 358, *cert. denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967)). In addition, a claim against the government first accrues when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence. *Id.; see also Kinsey v. United States*, 852 F.2d 556, 557 n. * (Fed.Cir.1988) ("a claim does not accrue unless the claimant knew or should have known that the claim existed").

That being said, RRII was informed that his bid was denied on January 24, 1995, when CO Sarah Hales of the DRMS informed RRII that its bid was rejected for being a non-responsive negative bid. RRII subsequently received a letter on February 23, 1995 from the GAO stating:

we have closed our file on this protest because the agency has canceled the underlying solicitation. The cancellation of a solicitation renders [your] protest academic. We do not consider academic protests because to do so would serve no useful public policy purpose.

More than likely, RRII claim accrued when on February 18, 1995, RRII filed its initial "claim" protesting the rejection of its

bid and the CO's decision to reject all bids. Or, resolving all possible doubt in plaintiff's favor, RRII either knew or should have known that a possible claim had accrued when, at the very latest, RRII received the GAO letter, on February 23, 1995, declaring its protest "academic" There is simply no excuse, no justification, for RRII to wait until January 30, 2002—well over six years—before commencing the action *sub judice.* Plaintiff cannot with a straight face assert that the cause for its procrastination was that it had received no "final decision," no word from the DRMS' CO. Surely that pretext holds no water, for RRII likewise delayed over six years before it even reminded the DRMS that its "claim" was allegedly still pending before its CO. Such unreasonable tardiness is inexcusable.

### III. Conclusion

For the foregoing reasons, the defendant's motion to dismiss is granted, with judgment being entered in favor of the United States.

**IT IS SO ORDERED.**

No costs allowed.